TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00111-CV






Commission on State Emergency Communications, Appellant


v.


TracFone Wireless, Inc. and Virgin Mobile USA, LP, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. D-1-GN-08-003039, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING



 

O P I N I O N

 Appellees TracFone Wireless, Inc. and Virgin Mobile USA, LP (collectively, "the
Prepaid Providers") sued the Commission on State Emergency Communications ("the Commission")
for judicial review of the agency's final order concluding that the 9-1-1 emergency service fee
imposed by health and safety code section 771.0711 applies to the wireless telecommunications
connections the Prepaid Providers provide to their customers. See Tex. Health & Safety Code Ann.
§ 771.0711 (West 2010). The district court reversed the Commission's order, and this appeal
followed. We will reverse the district court's judgment.


BACKGROUND

 Chapter 771 of the Texas Health and Safety Code governs the administration of
emergency communications in Texas and provides that the Commission is the State's authority on
emergency communications. See id. § 711.051(a) (West 2010). The Commission has primary
responsibility for administering the implementation of a statewide system that ensures that wireless
callers can be identified and located when they dial 9-1-1 for emergency assistance. Id.
§§ 771.051(a)(2)(A), .0711(a). To fund the system, section 771.0711 provides that the Commission
"shall impose on each wireless telecommunications connection a 9-1-1 emergency service fee." Id.
§ 771.0711(a). The statute further provides that a wireless service provider must collect the fee "in
an amount equal to 50 cents a month for each wireless telecommunications connection from its
subscribers" and must pay the money collected to the Comptroller "not later than the 30th day after
the last day of the month during which the fees were collected." Id. § 771.0711(b). Section 771.073
requires that the service provider "collect the fees [] in the same manner it collects those charges for
service" and that the fee must be "stated separately on the customer's bill." Id. § 771.073(a) 
(West 2010).

 Customers pay for wireless telecommunications connections and services using one
of two different methods: postpaid and prepaid. A customer who obtains a connection from a
postpaid provider typically pays a set amount monthly for the use of up to a specified number of
minutes each month and pays additional fees for any minutes used in excess of that specified
number. A postpaid provider sends its customers a monthly bill assessing charges for the connection
and for the services used during the preceding month, usually measured in minutes. The Prepaid
Providers, on the other hand, provide their customers with the wireless telecommunications
connection and services on a prepaid basis. They do not enter into extended term contracts with their
customers and, because their customers pay in advance, do not send them periodic bills. The Prepaid
Providers' customers pay for their wireless telecommunications connection and service in advance
by purchasing a handset and a wireless card, which is denominated for either a fixed dollar amount
of service or a fixed number of minutes of service. Customers typically purchase the handset and
wireless card from a third-party retailer such as Wal-Mart or Target, although they may also purchase
them directly from the Prepaid Providers using the internet. After purchasing the handset and
wireless card, the user contacts the Prepaid Providers by telephone or over the internet to request that
the handset be activated. When activated, each handset is assigned a telephone number with an area
code based on a ZIP code provided by the user, thereby establishing a wireless telecommunications
connection. The wireless card allows the customer to use the handset to make calls until either the
number of purchased minutes or the dollar amount of service is used up. The customer may later
purchase additional minutes or dollar amounts of use for a TracFone or Virgin Mobile handset by
purchasing an additional wireless card and entering the code printed on that card. The connection
represented by the assigned telephone number is automatically deactivated after 90 days (plus a grace
period) unless it is renewed by the purchase of additional minutes.

 For the time period between January 1, 2001 and September 30, 2003, TracFone paid
the Comptroller $767,515.26 as 9-1-1 emergency service fees pursuant to health and safety code
section 771.0711. For the time period between November 1, 2002 and May 1, 2005, Virgin Mobile
paid the Comptroller $1,525,484.07 as 9-1-1 emergency service fees. In 2005, TracFone and Virgin
Mobile filed refund requests with both the Commission and the Comptroller, seeking a refund of the
entire amounts paid. The refund requests were based on their contention that section 771.0711 does
not apply to the prepaid wireless products they provide and therefore the wireless
telecommunications connections obtained by their customers are not subject to the 9-1-1 emergency
service fee imposed by that statute.

 On receiving the refund requests, the Commission sought an opinion from the Texas
Attorney General as to which agency--the Commission or the Comptroller--had primary
jurisdiction to determine, in the context of a claim for a refund, "whether a 9-1-1 emergency service
fee imposed on wireless telecommunications connections by Texas Health and Safety Code section
771.0711(a) applies to a service provider's specific service." The Attorney General issued an
opinion stating that the Commission had the authority to determine whether section 711.0711(a)
applies to a wireless service provider's particular service, while the Comptroller had the authority
to order a refund of fees collected pursuant to that section. See Op. Tex. Att'y Gen. No. GA-0401
(2006). The Attorney General further stated:


 A claim for a refund of the fee imposed under that section must be filed with the
Comptroller, but if the claim presents issues particularly within the Commission's
expertise, the Comptroller should abate the administrative proceeding to allow the
Commission to make the initial determination of those issues.



Id. Following the issuance of this opinion by the Attorney General, the Commission initiated a
contested case against the Prepaid Providers and referred the case to the State Office of
Administrative Hearings (SOAH) to determine whether section 771.0711 applies to the prepaid
wireless telecommunications connections they provide. The Comptroller abated the refund
proceedings pending resolution of the contested case by SOAH.

 After a hearing before a SOAH administrative law judge (ALJ), the ALJ issued a
proposal for decision (PFD) in which she concluded that section 771.0711's provision imposing a
9-1-1 emergency service fee on "each wireless telecommunications connection" applied to the
wireless telecommunications connections used by the Prepaid Providers' customers. In a final order
issued in June 2008, the Commission adopted the PFD, including the proposed findings of fact and
conclusions of law.

 In August 2008, the Prepaid Providers filed in Travis County district court a petition
for judicial review of the Commission's order. After full briefing and a hearing before the court, the
district court rendered judgment reversing the Commission's order. In its judgment, the court stated
that the Commission "erroneously concluded that Texas Health & Safety Code §§ 771.0711 and
771.073 apply to TracFone Wireless, Inc. and Virgin Mobile, L.P. and their end users during the
periods at issue." This appeal followed. In two issues, the Commission contends that: (1) the fee
imposed on wireless telecommunications connections by health and safety code section 771.0711(a)
applies equally to all users of those connections regardless of whether they were purchased on a
postpaid or prepaid basis, and (2) the Commission's final order did not violate the Prepaid Providers'
constitutional rights, including their rights to due process and equal protection.


STANDARD OF REVIEW

 The primary issue before this Court involves construction of a statute: whether the
Commission correctly concluded that health and safety code section 771.0711applies to the
wireless telecommunications connections obtained by the Prepaid Providers' customers. 
Statutory construction presents a question of law that we review de novo. See State v. Shumake,
199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in construing statutes is to give effect to
the legislature's intent. Galbraith Eng'g Consultants, Inc. v. Pochucha, 290 S.W.3d 863, 867 (Tex.
2009). The plain meaning of the text is the best expression of legislative intent unless a different
meaning is supplied by legislative definition or is apparent from the context, or unless the plain
meaning leads to absurd or nonsensical results. City of Rockwall v. Hughes, 246 S.W.3d 621, 625-26
(Tex. 2008); see Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read
in context and construed according to the rules of grammar and common usage."). We look to the
entire act in determining the legislature's intent with respect to a specific provision. Upjohn Co.
v. Rylander, 38 S.W.3d 600, 607 (Tex. App.--Austin 2000, pet. denied). We are required to give
"serious consideration" to the construction of a statute by the administrative agency charged with
its enforcement, Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water, No. 08-0497,
2011 WL 836827, at *4 (Tex. Mar. 11, 2011), and will generally uphold the agency's interpretation
"so long as the construction is reasonable and does not contradict the plain language of the statute." 
First Am. Title Ins. Co. v. Combs, 258 S.W.3d 627, 632 (Tex. 2008) (quoting Tarrant Appraisal
Dist. v. Moore, 845 S.W.2d 820, 823 (Tex. 1993)); see also Fiess v. State Farm Lloyds,
202 S.W.3d 744, 747-48 (Tex. 2006) (courts give some deference to agency regulation containing
reasonable interpretation of ambiguous statute). If, after applying these dominant rules of
construction, doubt about a tax statute's application still remains, we give the statute a "stricter
construction," Calvert v. Texas Pipe Line Co., 517 S.W.2d 777, 781 (Tex. 1974), meaning that we
resolve ambiguities in favor of the taxpayer and against the taxing authority, Gables Realty L.P.
v. Travis Cent. Appraisal Dist., 81 S.W.3d 869, 872 n.3 (Tex. App.--Austin 2002, pet. denied).



DISCUSSION

 At issue is whether section 771.0711(a) of the health and safety code applies to the
prepaid wireless telecommunications connections obtained by the Prepaid Providers' customers. 
Section 771.0711(a) provides:


 To provide for automatic number identification and automatic location identification
of wireless 9-1-1 calls, the commission shall impose on each wireless
telecommunications connection a 9-1-1 emergency service fee. A political
subdivision may not impose another fee on a wireless service provider or subscriber
for 9-1-1 emergency service.



Tex. Health & Safety Code Ann. § 771.0711(a) (emphasis added). A "wireless telecommunications
connection" is defined as "any wireless communication mobile station assigned a number containing
an area code assigned to Texas by the North American Numbering Plan Administrator that connects
a wireless service provider to the local exchange service provider." Id. § 771.001(13) (West 2010). 
Thus, the plain language of section 771.0711(a) imposes a 9-1-1 emergency service fee on each
wireless telecommunications connection and contains no language limiting its scope based on the
manner in which the wireless user purchases that connection. It is undisputed that customers of the
Prepaid Providers obtain a "wireless telecommunications connection" through their purchase and
activation of a handset. We agree with the Commission, therefore, that the plain language of section
771.0711(a) requires that the fee be imposed on all wireless telecommunications connections,
including those provided by the Prepaid Providers to their customers on a prepaid basis.

 We must, however, consider the statute as a whole and not any provision in isolation. 
See Continental Cas. Co. v. Downs, 81 S.W.3d 803, 805 (Tex. 2002). The Prepaid Providers
contend that the statute's specific fee assessment and collection methods evidence a legislative intent
that their customers, who pay for their wireless telecommunications connections in advance, are not
subject to the 9-1-1 emergency service fee. See Tex. Health & Safety Code Ann. §§ 771.0711(b);
.073. They argue that these separate statutory provisions define section 771.0711's true scope and
demonstrate that the fee was never intended to apply to wireless telecommunication connections
provided on a prepaid basis. We address each of their arguments below.


Manner of Assessing and Collecting the Fee

 The statute provides that "[a] wireless service provider shall collect the fee in an
amount equal to 50 cents a month for each wireless telecommunications connection from its
subscribers and shall pay the money collected to the comptroller not later than the 30th day after the
last day of the month during which the fees were collected." See id. § 771.0711(b). Section 771.073
prescribes the method for collecting the fee:


 A customer on which a fee or surcharge is imposed under this subchapter is liable for
the fee or surcharge in the same manner as the customer is liable for the charges for
services provided by the service provider. The service provider shall collect the fees
and surcharges in the same manner it collects those charges for services, except that
the service provider is not required to take legal action to enforce the collection
of the fees or surcharges. A fee or surcharge must be stated separately on the
customer's bill.



Id. § 771.073(a). The Prepaid Providers contend that these requirements, read in harmony with
section 771.0711(a), reflect the legislature's intent to impose the fee only on telecommunications
connections provided using the postpaid wireless service business model and not on those
telecommunications connections that are obtained on a prepaid basis.

 We do not agree that the statutory provisions addressing the method of assessing and
collecting the fee demonstrate a clear intent to limit the fee to wireless telecommunications
connections paid for in any particular manner. The Prepaid Providers characterize these provisions
as requiring monthly billing, a practice they do not engage in. Nothing in the statute, however,
requires that the fee be assessed in a monthly bill or collected on a monthly basis. Rather, the
provision directs the provider to assess and collect a fee "in an amount equal to 50 cents a month." 
Although assessing a fee of exactly 50 cents due each month is one method that would accomplish
the statutory directive, it is not apparent that it is the only way. And the provider is not required to
remit the fees on a monthly basis; it is simply required to remit to the Comptroller any fees it has
collected in a particular month no later than 30 days after the last day of that month.

 The Prepaid Providers next assert that the statute's mandate that the fee be collected
"in the same manner [the service provider] collects those charges for services" and that the fee "must
be stated separately on the customer's bill" is incompatible with their business model. They rely on
this alleged incompatibility to support their position that the statute contemplates imposing a fee only
on the customers of wireless service providers that send out a monthly bill and therefore, they argue,
demonstrates that "the sole object of the e911 fee contemplated by the legislature was the traditional
model of monthly post-paid wireless service." (1) The statute does not, however, require that the
service provider send its customers bills or charge for its product in any particular manner. Rather,
the statute effectively directs the provider to collect the fee in whatever manner it employs to collect
other charges from its customers and to apprise the customer of the amount of that fee. The record
does not show that it would be impossible for the Prepaid Providers' business practices to be
reconciled with the statute. (2) Indeed, in the PFD, the ALJ described various ways in which the
Prepaid Providers could meet the assessment and collection procedures under their prepaid business
model. While their chosen business model may make it more difficult for them to assess and collect
the fee, such a difficulty does not itself evince a legislative intent to exclude the telecommunications
connections they provide from the reach of section 711.0711. (3) A wireless telecommunications
connection remains such regardless of the manner in which it is marketed and sold, and section
771.0711(a) imposes a fee on "each" wireless telecommunications connection. (4) The fact that the
legislature apparently tailored the manner of assessing and collecting the fee to fit the then-predominant business model does not necessarily indicate an intent to exclude wireless
telecommunications connections marketed using a different business model, particularly if, as the
Prepaid Providers claim, that different business model was novel at the time the statute was enacted. 
It is too great a leap for us to infer that, when drafting the statute, the legislature intended to exclude
this sector of the industry from the 9-1-1 emergency service fee.


Definition of "Subscribers"

 The Prepaid Providers also argue that the plain statutory language applying the 9-1-1
emergency service fee to "each" wireless telecommunication connection is overcome because the
statute elsewhere directs wireless service providers to collect the fee from their "subscribers" and,
according to the Prepaid Providers, their customers are not "subscribers" as that term is used in the
statute. See id. § 771.0711 (b). The legislature has not defined the term "subscriber," so we construe
it according to its plain and common meaning unless a contrary intention is apparent from the
context, or unless such a construction leads to nonsensical or absurd results. See FKM P'ship, Ltd.
v. Board of Regents of Univ. of Houston Sys., 255 S.W.3d 619, 633 (Tex. 2008); see also Tex. Gov't
Code Ann. § 311.011. The Prepaid Providers contend that, applying a reasonable construction based
on common usage, one must incur a "periodic and recurrent" obligation to be considered a
"subscriber." They assert that their customers, who pay for their wireless telecommunication
connections in advance, are not "subscribers" because the service they receive is not "pursuant to
a periodic contract." The Prepaid Providers rely on a dictionary definition of the verb "subscribe"
to support their position, but they include only a portion of that definition. The complete definition
reads: "to enter one's name for a publication or service; also: to receive a periodical or service
regularly on order." See Merriam-Webster Collegiate Dictionary 1244 (11th ed. 2008). Thus, even
if it were controlling, this dictionary definition of the term "subscribe" does not compel the narrow
construction urged by the Prepaid Providers.

 Moreover, their own marketing materials belie their claim that the term's common
meaning encompasses only one who "incurs a regular and periodic obligation in exchange for an
ongoing or periodic provision of service." The ALJ noted in her PFD that "[o]n its website,
TracFone states that it has over 6.5 million subscribers," and at least one version of a document
setting forth Virgin Mobile's terms and conditions of service refers to purchasers of its products as
both "customers" and "subscribers." Rather than infer from the statute's use of the term "subscriber"
a legislative intent to exclude an entire subset of wireless telecommunications connections from the
9-1-1 emergency service fee, it is more reasonable to conclude that, like TracFone and Virgin Mobile
themselves, the legislature used the terms interchangeably. An intent to exclude a particular subset
of wireless service users from the fee is even more unlikely if, as the Prepaid Providers contend, that
category of users was not widely recognized when the statute was drafted.

 Our construction of the term "subscriber" comports with the object the legislature
sought to obtain in enacting the statute--to fund a system to provide enhanced 9-1-1 emergency
services to all wireless users. See Tex. Gov't Code Ann. § 311.023(1) (West 2005). By requiring
all wireless users who can access the benefits of the 9-1-1 system to contribute to the funds needed
to provide automatic number and location identification, this construction also honors the
presumption that the legislature intended the statute to effect a just and reasonable result. See id.
§ 311.021(3) (West 2005).


Subsequent Legislation (Health and Safety Code Section 771.0712)

 In 2009, the legislature enacted health and safety code section 771.0712, which
expressly applies to "prepaid wireless telecommunications service" and provides in part:


 [A] prepaid wireless 9-1-1 services fee of two percent of the purchase price of each
prepaid wireless telecommunications service purchased by any method, shall be
collected by the seller from the consumer at the time of each retail transaction of
prepaid wireless telecommunications service occurring in this state . . . .


Tex. Health & Safety Code Ann. § 771.0712 (West 2010). (5) The Prepaid Providers assert that this
subsequent amendment to the health and safety code supports their position that section 771.0711
does not apply to the wireless products they provide because if, by virtue of section 771.0711, their
prepaid business model were already subject to the 9-1-1 emergency service fee, then passage of
section 771.0712 would have been unnecessary. The Prepaid Providers argue that the legislature's
passage of section 771.0712 is persuasive evidence that section 771.0711 was not intended to apply
to them. See State Highway Dep't v. Gorham, 162 S.W.2d 934, 937 (Tex. 1942); Williamson Pointe
Venture v. City of Austin, 912 S.W.2d 340, 345 (Tex. App.--Austin 1995, no writ) ("One
legislature's interpretation of a prior legislature's enactment may be persuasive but does not control
the interpretation of the prior act."). However, other cases state that one session of the legislature
does not have the power to declare the intent of a past session. See Rowan Oil Co. v. Texas
Employment Comm'n, 263 S.W.2d 140, 144 (Tex. 1953); Ex parte Schroeter, 958 S.W.2d 811, 813
(Tex. Crim. App. 1997) ("[O]ne session of the legislature does not have the power to declare the
intent of a past session, and a legislative construction of an act of another legislature is uniformly
held to be entitled to little weight."); Strayhorn v. Willow Creek Res., Inc., 161 S.W.3d 716,
722 (Tex. App.--Austin 2005, no pet.) ("[T]he intent or understanding of the 78th Legislature
offers no insight into the intent of previous legislatures."); Adams v. Baxter Healthcare Corp.,
998 S.W.2d 349, 355 (Tex. App.--Austin 1999, no pet.).

 Even if we consider section 711.0712 in construing 711.0711, however, it does not
support the Prepaid Providers' position because there is an equally plausible alternative reason for
the legislature to have added section 771.0712: that it may have recognized that the then-existing
fee assessment and collection procedures were unwieldy as applied to service providers who sold
wireless telecommunications connections on a prepaid basis and therefore amended the statute to
permit those providers to collect the 9-1-1 emergency service fee in a manner more suited to their
business model.

 The Prepaid Providers also claim that when the legislature enacted section 771.0712,
it changed the law and created a new fee on prepaid wireless. They argue that this legislative act is
persuasive evidence that prepaid wireless is not within the scope of section 771.0711 and again
contradicts, rather than supports, a construction of section 771.0711 as imposing a fee on prepaid
wireless telecommunications connections. The Prepaid Providers assert that if later legislation
differs significantly from existing law, the later legislation must be construed as changing, rather
than clarifying, existing law. See Williamson Pointe Venture, 912 S.W.2d at 345. In the absence
of some showing, either by legislative history or otherwise, that the intent of the legislature in
adopting the amendment was to clarify rather than change the statute in question, we generally
presume that legislative amendments are designed to change rather than clarify the existing statute. 
See Public Util. Comm'n v. Cities of Harlingen, 311 S.W.3d 610, 620 n.7 (Tex. App.--Austin 2010,
no pet.). "However, the time and circumstances surrounding the enactment of the amendment may
indicate that the change wrought by the amendment was formal only--that the legislature intended
merely to interpret the original act." 1A Norman J. Singer, Sutherland Statutory Construction
§ 22.30 (6th ed. 2002). (6)

 Even employing the presumption of change, however, does not lead to the conclusion
that the new provision here necessarily had the effect of imposing a new fee. The new provision
addresses the manner of assessing and collecting the existing 9-1-1 emergency service fee
specifically with respect to the prepaid wireless service. The change, then, arguably goes only to the
manner in which prepaid wireless service providers assess and collect the 9-1-1 emergency service
fee. (7) It is at least equally reasonable that the new provision resulted from the legislature's
recognition of the need to accommodate the growing prepaid wireless business model. In response,
the legislature may have drafted and passed a statute that prescribes a different and more suitable
method for providers of prepaid services to calculate and collect the existing 9-1-1 emergency
service fee. (8) We do not agree that the legislature's enactment of section 771.0712 is inconsistent
with our construction of section 771.0711.

 The Prepaid Providers also claim that section 771.0712 represents a logical
progression of taxation, which naturally lags behind emerging technologies. They argue that just as
771.0711 was a new fee created to tax a new technology (wireless telecommunications connections
as opposed to local exchange access lines, see Tex. Health & Safety Code Ann. § 771.071,
commonly referred to as "land lines"), section 771.0712 is a new fee created to tax another
new technology--prepaid wireless telecommunications connections as opposed to postpaid
wireless connections. But prepaid wireless telecommunication connections do not differ
technologically from postpaid wireless telecommunication connections; the only difference is the
business model employed by the Prepaid Providers. The fee imposed by section 771.0711 is
imposed on the connection itself, without regard to the manner in which that connection is marketed
and sold to the user.


Effect of Texas Tax Code

 The Prepaid Providers also contend that certain provisions of the tax code prohibit
the assessment of a 9-1-1 emergency service fee on their prepaid customers' wireless
telecommunications connections. Specifically, they point to tax code section 151.061, which
contains a provision prohibiting the imposition of taxes, charges, or fees on mobile
telecommunications services provided to a customer in a taxing jurisdiction unless the customer's
"place of primary use" is encompassed by the territorial limits of that taxing jurisdiction. See Tex.
Tax Code Ann. § 151.061(c) (West 2008). Section 151.061 implements the federal Mobile
Telecommunications Sourcing Act, 4 U.S.C.A. §§ 116-126 (West 2005), and establishes sourcing
rules for state and local taxation of mobile telecommunications services. The bill analysis explains
the background and purpose of section 151.061 as follows:


 As a result of some mobile telecommunications customers (customer) using service
in various locations, several different state and local tax laws may apply. Federal law
provides that a customer's place of primary use is the single source for determining
tax revenue, regardless of where the call originates, passes through, or terminates. 
Conforming state law to federal law ensures that Texas limits the determination of
tax revenue to a single source for a customer. Senate Bill 1497 conforms Texas law
to federal law.



House Comm. on Ways & Means, Bill Analysis, Tex. S.B. 1497, 77th Leg., R.S. (2001).

 Thus, section 151.061 (i) provides a framework for identifying the "place of primary
use" of mobile telecommunications services, and (ii) permits taxes, fees, and charges on those
services to be imposed only by the taxing authority whose jurisdiction encompasses that "place of
primary use." See Tex. Tax Code Ann. § 151.061(c). Significantly, the sourcing rules apply only
to "mobile telecommunications services." Id. The Prepaid Providers assert that users of the services
they provide have no "place of primary use" because their services are excluded from the definition
of "telecommunications services" and because the statute expressly defines "place of primary use"
in terms of where a customer uses a "mobile telecommunications service." The statute defines
"place of primary use" as

 the street address that is representative of where the customer's use of the mobile
telecommunications service primarily occurs. That location must be the residential
street address or the primary business street address of the customer that is within the
licensed service area of the home service provider.



Id. § 151.061(a)(2) (emphasis added). The Prepaid Providers claim that the mobile
telecommunications products they provide do not fall within "telecommunications services" because
the wireless card that accompanies the handset they sell to their customers constitutes a "telephone
prepaid calling card," which is expressly excluded from the definition of "telecommunications
services." See id. §§ 151.0103(a)(2), .01032. Since their customers are not using
"telecommunications services," they assert, the statute does not assign them a "place of primary use." 
According to the Prepaid Providers, it follows that the Commission cannot impose the 9-1-1
emergency service fee on these customers because their "place of primary use" is not in Texas, or
apparently anywhere else. Assuming without deciding that the wireless cards they sell constitute
"telephone prepaid calling cards" within the meaning of the tax code, we disagree with the Prepaid
Providers' argument for the following reasons.


 (1) The Prepaid Providers' Argument Depends on Selective Application of Statutory
Definitions


 The statute plainly states that the sourcing rules govern the sourcing of charges for
"mobile telecommunications services." Id. § 151.061(c). Because the statute limits only the taxation
of the services it covers, if, as the Prepaid Providers contend, the products they provide do not fall
within the tax code's definition of "telecommunications services," the sourcing rules do not apply
to those products at all and cannot operate to prohibit their taxation. The Prepaid Providers'
argument depends on their characterization of the products they provide as "telecommunications
services" for one purpose (application of the sourcing rules) but not for another (designation of
primary place of use). Accepting their assertion that their products are not "mobile
telecommunications services" leads to the conclusion that the sourcing rules are not applicable and
therefore do not prohibit a particular taxing authority from imposing taxes, fees, or charges on them.

 

 (2) The Prepaid Providers' Argument Would Avoid Taxation By Any Taxing Jurisdiction

 Moreover, if the statute operated in a manner that resulted in their customers' having
no "place of primary use," then no taxing jurisdiction would have authority to impose taxes, fees,
or charges on them. Yet the Prepaid Providers insist that tax code section 151.061 and health and
safety code 771.0735 together embody just such a policy decision. But if, as the Prepaid Providers
contend, section 771.0735 precludes imposition of a fee under 771.0711, then it must also preclude
the imposition of a fee under 771.0712. Such a result cannot be squared with the Prepaid Providers'
own assertions regarding the purpose of health and safety code section 771.0712 or with that
section's legislative history. It is undisputed that section 771.0712 requires sellers of prepaid
wireless telecommunications services to collect a 9-1-1 emergency service fee from their customers. 
We decline to read the sourcing rules in a manner that eviscerates 771.0712 and so plainly
contradicts the legislature's intent.


 (3) "Connection" v. "Service"

 The sourcing rules apply to and regulate the taxation of mobile telecommunication
services rather than to wireless telecommunications connections. Compare Tex. Tax Code Ann.
§ 771.0561(c) with Tex. Health & Safety Code Ann. § 771.0711(a). As stated above, the tax code
defines "telecommunications service" as "electronic or electrical transmission, conveyance, routing,
or reception of sounds, signals, data, or information utilizing wires, cable, radio waves, microwaves,
satellites, fiber optics, or any other method now in existence or that may be devised, including but
not limited to long-distance telephone service." See Tex. Tax Code Ann. § 151.0103. Application
of the sourcing rules to services, rather than connections, is consistent with the goal of avoiding
multiple taxation of sound or data transmissions that frequently originate in one taxing jurisdiction,
terminate in another, and pass through others along the way. By contrast, a wireless
telecommunications connection is a "wireless communication station assigned a number containing
an area code." See Tex. Health & Safety Code Ann. § 771.001(13). A connection is, by definition,
fixed in one taxing jurisdiction. When there is only one potential taxing jurisdiction, sourcing rules
are unnecessary and serve no purpose. The 9-1-1 emergency service fee contained in section
771.0711(a) is imposed on telecommunications connections rather than services. Thus, it appears
that the sourcing rules, by their own terms, do not apply to the fee on connections imposed by section
771.0711. It is also logical to conclude that the sourcing rules do not apply to a fee on a
telecommunications connection because concerns about multiple taxation are absent. In that case,
the Prepaid Providers' reliance on the sourcing rules is wholly misplaced, as those rules simply have
no application here.

 From the foregoing, it appears sensible to conclude that the sourcing rules do not
apply here. We note, however, that health and safety code section 771.0735(3) provides that "the
fee imposed on wireless telecommunications bills shall be administered in accordance with Section
151.061, Tax Code," i.e., the sourcing rules. While this perplexing provision speaks to a "fee
imposed on wireless telecommunications bills" rather than a fee on connections or services, it could
be construed as a directive that the sourcing rules be applied to the 9-1-1 emergency service fee at
issue here. Alternatively, it could reasonably be construed to mean that a fee for services that is
"imposed on a wireless telecommunications bill" is governed by the sourcing rules, but a fee for a
connection is not. Because this issue is not directly before us, we need not decide today whether the
sourcing rules apply to the 9-1-1 emergency service fee. Suffice it to say that the sourcing rules
contained in section 151.061 of the tax code provide no basis for disregarding the plain statutory
language imposing that fee on "each wireless telecommunications connection." See Tex. Health
& Safety Code Ann. § 771.0711(a).


Threat of Double Taxation

 The Prepaid Providers next complain that interpreting the statute as urged by the
Commission will result in their services being taxed twice, i.e., under both section 771.0711 and
section 771.0712. Although the precise scope and effect of section 771.0712 is not before us, the
Commission does not argue in this case that both taxing provisions would apply to the Prepaid
Providers. The Prepaid Providers' concern arises, again, out of their assumption that section
771.0712 creates a new fee, when it is not at all clear that it does. The hypothetical threat of double
taxation does not alter our analysis of the scope of section 771.0711.


Section 771.0711 Applies to All Wireless Telecommunications Connections

 Having considered the plain language of the statute and employed the dominant rules
of statutory construction, we conclude that section 771.0711 unambiguously imposes a 9-1-1
emergency service fee on all wireless telecommunications connections, regardless of whether they
are marketed and sold using a prepaid or postpaid business model. We are not persuaded that the
provisions addressing the amount of the fee and the collection procedures manifest a legislative
intent that the 9-1-1 emergency service fee not apply to wireless telecommunications connections
that are sold through the prepaid business model employed by the Prepaid Providers.

 Even if we considered the statutory language to create an ambiguity as to that
question, however, the result would be the same. When a statute is ambiguous, we must "give
serious consideration" to the "[c]onstruction of [the] statute by the administrative agency charged
with its enforcement," Texas Citizens, 2011 WL 836827, at *4, and uphold that agency's
interpretation if it is reasonable and does not contradict the plain language of the statute. See First
Am. Title Ins. Co., 258 S.W.3d at 632. Section 711.0711(a) states that "the Commission shall
impose" the 9-1-1 emergency service fee, and the Attorney General has determined that "the
authority to resolve a claim about the applicability of section 771.071(a) to a wireless
telecommunications connection based on the nature of the provider's service is [] clearly within the
Commission's purview." See Op. Tex. Att'y Gen. No. GA-0401 (2006). After applying the
dominant rules of statutory construction, including giving serious consideration to the Commission's
reasonable interpretation, we conclude that no doubt remains about the statute's application to the
wireless telecommunications connections sold by the Prepaid Providers. Accordingly, we are not
authorized to use the statutory construction aid of "stricter construction" in favor of the taxpayer and
against the taxing authority:


 [A]lthough we have applied a "stricter construction" to tax statutes in the past, we
have done so only when "doubt about [the statute's] application remains after
dominant rules of construction have been applied." One of those "dominant rules of
construction" requires us to give "serious consideration" to the "[c]onstruction of a
statute by the administrative agency charged with its enforcement."



First Am. Title Ins. Co., 258 S.W.3d at 632 (citations omitted).

 Nonetheless, the Prepaid Providers contend that there are a number of "procedural
errors" that vitiate the Commission's decision and preclude any deference to its decision. First, they
assert that the Commission "improperly shifted the burden of proof" to the Prepaid Providers to
show that section 711.0711 did not apply to them. However, the issue before the Commission was
one of statutory construction, a purely legal question that does not involve evidentiary issues or
burdens of proof. The Commission did not assume the statute's applicability and then require the
Prepaid Providers to prove they were entitled to an exemption from that statute; rather, the
Commission considered whether or not the Prepaid Providers' wireless telecommunications
connections were subject to the 9-1-1 emergency service fee in the first instance. In reaching its
conclusion regarding the proper construction of the statute, the Commission considered the Prepaid
Providers' argument that their inability to comply with the assessment and collection provisions
contained in the statute demonstrated that the legislature intended for the services they provided to
be outside the scope of section 711.0711. But the Commission did not require the Prepaid Providers
to prove that compliance was impossible in order to avoid application of the statute. The
Commission's conclusion that prepaid wireless telecommunications are subject to the 9-1-1
emergency service fee in section 711.0711 resulted from its application of rules of statutory
construction, not on any failure by the Prepaid Providers to provide evidence of any particular facts. 

 We also reject the Prepaid Providers' bare assertions that (1) the Commission "paid
substantial and undue deference" to the positions of its staff and outside counsel, (2) the outcome
of the case was "predetermined," and (3) the Commission failed to provide sufficient analysis to
support its position, thereby depriving them of due process. The ALJ issued a detailed proposal for
decision, and the Commission's final order adopted, with some modifications, the ALJ's findings
of fact and conclusions of law. The proposal for decision and final order reflect a balanced
consideration of the arguments advanced by both parties and supply sufficient analysis to support
the Commission's conclusion, a conclusion that this Court too has reached after conducting a de
novo review of the district court's order. Although the Prepaid Providers disagree with the result,
the Commission explained the rationale for the decision it reached after providing the parties notice
and an opportunity to be heard at a meaningful time and in a meaningful manner. See Mathews
v. Eldridge, 424 U.S. 319, 333 (1976).

 Finally, the Prepaid Providers assert that the Commission's decision applying section
771.0711 to the wireless telecommunications connections of their customers violates the Texas
Constitution's guarantee of equal and uniform taxation, see Tex. Const. art. VIII, § 1, because it
effectively requires them to "shoulder the burden of paying their users' e911 fee amounts because
they cannot collect the fee in compliance with § 771.073(a)." Although the Prepaid Providers have
argued that, because of their prepaid business model, they could not comply with the statutory
provisions prescribing the manner of assessing and collecting the 9-1-1 emergency service fee, the
record does not show that they were unable to collect the fee from their users. Nor did the
Commission "single[] out TracFone and Virgin Mobile as the only prepaid wireless resellers subject
to the e911 fee during the refund period." This proceeding was initiated by the Prepaid Providers
when they sought a refund of taxes they had voluntarily paid the Comptroller. The contested-case
hearing arose out of the Comptroller's and the Commission's efforts to resolve the Prepaid
Providers' claims for a tax refund, not out of the Comptroller's or the Commission's attempts to
selectively apply or enforce a tax statute against certain providers.

 For the foregoing reasons, we hold that health and safety code section 771.0711
applies to the wireless telecommunications connections the Prepaid Providers provide to
their customers.


CONCLUSION

 We reverse the district court's judgment and render judgment that Texas Health and
Safety Code section 771.0711 applies to the prepaid wireless telecommunications connections that
TracFone and Virgin Mobile provide to their customers.


 __________________________________________

 J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Reversed and Rendered

Filed: May 5, 2011

1. The Washington Supreme Court rejected a similar argument advanced by TracFone that
challenged the application of that state's enhanced 911 excise tax to prepaid wireless service. The
court noted that the statute does not itself require that TracFone send its customers a bill, only that 
if a billing statement is sent, the tax must be stated separately. The court further noted that, "the fact
that TracFone does not send monthly billing statements is a consequence of the way in which it
chooses to conduct its business," and "does not relieve TracFone of its obligations under the taxing
statute, nor does it convert a plainly taxable event into a nontaxable event." TracFone Wireless, Inc.
v. Department of Revenue, 242 P.3d 810, 819 (Wash. 2010).
2. The Washington Supreme Court addressed TracFone's contention that it could not comply
with that state's statute imposing a 20 cent per month fee on "all radio access lines." TracFone
asserted that this fee could not be uniformly calculated on prepaid wireless service because the
service is sold in block airtime and not by the month. The court observed that the statute defines a
"radio access line" as "the telephone number assigned to or used by a subscriber for two-way local
wireless voice service" and continued:


 [TracFone's argument] misapprehends what is being taxed. . . . If a subscriber has
a cell phone number assigned to the subscriber or used by the subscriber, the tax must
be paid. The tax is not imposed on the sale of airtime minutes nor is the tax based
upon the number or rate of minutes purchased or used in a month. . . . TracFone's
arguments, which are focused on numbers of minutes purchased and the rate at which
they are used, do not reflect the statute's taxation of telephone numbers for the
months that they are active. . . . Uniformity, as with the tax itself, is [] concerned with
access lines, not with how many minutes are used or the rate at which they are used. 
. . . As thus defined, uniformity is not the insurmountable problem that TracFone
claims. . . . As explained, TracFone knows whether an access line with a zip code in
this state is active in any given month. TracFone can therefore readily calculate the
tax for any given month.


TracFone Wireless, Inc., 242 P.3d at 816-18. 
3. Similar arguments by TracFone have failed in other jurisdictions. See TracFone Wireless,
Inc. v. Nebraska Public Serv. Comm'n, 778 N.W.2d 452, 459 (Neb. 2010) ("TracFone's choice of
business model does not give it license to throw up its hands and pay nothing."); TracFone Wireless,
Inc., 242 P.3d at 815 (observing that "TracFone's arguments are premised chiefly on the way in
which it conducts its business" and "[i]n effect, TracFone is seeking a decision that whether the tax
is owed depends upon how a company decides to market and charge for its service or, to put
it another way, whether the tax must be paid depends entirely upon the individual company's
business model"). 
4. See TracFone Wireless, Inc., 242 P.3d at 818 ("We do not agree that the manner in which
a clearly taxable event (an assigned cell phone number) is marketed can negate a tax that is otherwise
clearly payable.").
5. We note that section 771.0712 imposes a fee on "prepaid wireless telecommunications
service," whereas 771.0711(a) imposes a fee on "each wireless telecommunications connection." 
The tax code defines "telecommunications services" as "the electronic or electrical transmission,
conveyance, routing, or reception of sounds, signals, data, or information utilizing wires, cable, radio
waves, microwaves, satellites, fiber optics, or any other method now in existence or that may be
devised, including but not limited to long-distance telephone service." Tex. Tax Code Ann.
§ 151.0103 (West 2008). It is not clear that the legislature necessarily intended the two provisions
to tax the same element of wireless telecommunications. See Tex. Health & Safety Code Ann.
§ 771.001(13) (defining "wireless telecommunications connection"); Tex. Tax Code Ann.
§ 151.0103 (defining "telecommunication services"); see also Robertson v. Odom, 296 S.W.3d 151,
157 (Tex. App.--Houston [14th Dist.] 2009, no pet.) ("[W]hen construing a statutory word or
phrase, we may consider the meaning assigned to the term . . . in another act of similar nature."). 
Because we are not here construing section 771.0712, we express no opinion as to the significance,
if any, of the legislature's use of different terms in the two provisions. 
6. For example, if an amendment "was enacted soon after controversies arose as to the
interpretation of the original act, it is logical to regard the amendment as a legislative interpretation
of the original act." 1A Norman J. Singer, Sutherland Statutory Construction § 22.31 (6th ed. 2002).
7. A Kentucky federal district court reached this conclusion when addressing a similar
argument advanced by TracFone. The court noted that "the amendment only changed the method
of collection, not the general collection obligation of cell phone providers." The court continued: 
"[T]he amendments do effect a change in the law; they change the permissible method of collection,
adding new options to make it easier for prepaid providers to comply with the law while retaining
the same business model." See Commonwealth of Kentucky Commercial Radio Serv. Emergency
Bd. v. TracFone Wireless, Inc., 735 F. Supp. 2d 713, 724 n.12 (W.D. Ky. 2010).
8. If, as the Prepaid Providers insist, section 771.0712 imposes a new fee, it is not entirely
clear that the legislature intended the new fee to be simply the "prepaid wireless" equivalent of the
fee already imposed in section 771.0711. As previously noted, section 771.0712 imposes a fee on
"prepaid wireless telecommunications service" as opposed to the "wireless telecommunications
connection" that is the subject of the fee imposed by section 771.0711.